UNITED STATES of America

v.

John Floyd CAREY, Sr., Appellant.

No. 07–3773.

United States Court of Appeals,
Third Circuit.

Submitted Pursuant to Third Circuit
LAR 34.1(a) March 2, 2009.

Filed: July 20, 2009.

George J. Rocktashel, Esq., Office of United States Attorney, Williamsport, PA, for Appellee.

William J. Miele, Esq., Miele & Rymsza, Williamsport, PA, for Appellant.

Before: SCIRICA, Chief Judge, SLOVITER and HARDIMAN, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Chief Judge.

John Floyd Carey, Sr., was found guilty by a jury of arson, 18 U.S.C. § 844(i), the use of fire to commit a felony, 18 U.S.C. § 844(h), and four counts of mail fraud in violation of 18 U.S.C. § 1341. The District Court sentenced him to 183 months in prison and three years of supervised release, a special assessment of $600, and restitution in the amount of $500. Carey challenges his conviction, contending that two jurors deliberated prematurely and another spoke with a non-juror about the trial, and the court did not adequately investigate the impropriety. Carey also raises evidentiary challenges, contending his expert witnesses were improperly questioned about a report prepared by another, non-testifying expert. Also, he contends a letter from the insurance company denying coverage was prejudicial and should not have been admitted into evidence. We will affirm.

I

On October 11, 2001, shortly after 9:45 in the morning, John Floyd Carey, Sr., set fire to Carey's Country Store, his business in Sinnemahoning Pennsylvania. Carey owned the store with his then wife, Janice, who separated from her husband four days before the fire. Carey's Country Store was a two-story structure with a one-story addition attached on the south side. There was also a garage on the property, and gas pumps were located outside.

The morning of the fire, two technicians were on the property to take water samples for an environmental remediation system, which was needed to clean up a gasoline leak. They left the property between 9:30 and 9:40, while Carey was still there. Carey remained on the property alone until around 9:45. At approximately 10:05, a neighbor saw smoke rising from the roof of the one-story addition, but apparently mistook the smoke for steam. Another passerby reported the fire at 10:18. Firefighters arriving at the scene found smoke coming from the middle of the one-story,

attached addition. The doors into the building were blocked—one by an ice cream freezer, another by a stack of newspapers, a third by some other object the firefighters could not identify.

Carey's Country Store was a failing business. Payments on a bank loan had been delinquent for several months, and on October 5, 2001, less than one week before the fire, the bank had sent the Careys a letter informing them a foreclosure would be imminent if payments were not made. The loan was secured not only by the store, but also by other properties, including the family farm.[1] Moreover, in the months before the fire, vendors began demanding payment in cash, refusing to extend credit to the Careys, and store inventory dwindled. At the time of the fire, the Careys were $204,697 in debt, they had delinquent or currently due bills of $28,250, and they had only $2,483 of funds available to cover their obligations. In addition to these financial problems, the Pennsylvania Department of Environmental Protection had required the installation of the remediation system.

On April 30, 2002, Carey and his wife filed four proofs of loss with the Erie Insurance Group. These claimed $380,450 in losses for the building, contents, loss of income, and debris removal. In these proofs of loss, and during the insurance company's investigation into the fire and the ensuing civil litigation over the denial of coverage, Carey made several false statements about the fire and his involvement in it. For example, during the investigation into the fire, Carey claimed he left the property on the morning of the fire while the two technicians were still there. This would have established that he was not alone on the property around the time

the fire began. But Carey's account contradicted the technicians' testimony and their logbooks, which supported a finding that they left the property before Carey. In statements to insurance company investigators, Carey claimed he was not aware the store was insured despite meeting with an insurance agent approximately one month before the fire to discuss renewing his policy. Carey also told investigators that potential buyers of the store were coming to see the store on the morning of the fire. The only potential buyers .he named, however, were neighbors Delbert and Heather Baney who had informed Carey before the fire that they would not be interested in purchasing the store. Moreover, Carey gave several different explanations for the cause of the fire. Carey first blamed a neighbor for setting the fire, then his wife and son. After submitting his insurance claim, in statements made to insurance investigators, he suggested the fire was accidental, identifying an electric malfunction involving a milk cooler receptacle as a possible cause. After receiving Erie Insurance's denial-of-claim letter, he began asserting the electric-malfunction theory with more certainty and vigor, providing new details to support the theory. Some of these new details, such as the presence of flammable liquids near the milk cooler, contradicted previous statements. Moreover, testimony at trial suggested the milk cooler was functioning properly and was not plugged in near the origin of the fire. The false statements were all made as part of a scheme to defraud Erie Insurance into paying the insurance proceeds.

Carey was indicted and arrested. A jury convicted him of all charges, and he

---

1. During a 2000 refinancing, the bank had required the Careys to include the other prop-    erties as collateral.

appeals.[2]

## II

█ Carey challenges his conviction on the ground that some juror communications prior to deliberations were improper. Carey contends the District Court should have investigated these communications, questioning jurors to determine if they had been prejudiced. The court's failure to do so, he claims, is ground for a new trial, even though the questioning would have interrupted jury deliberations.

On the second day of jury deliberations, the District Court advised counsel of potentially improper juror communications, involving both intra-jury communication and extra-jury communication. The District Court held a hearing and called several court personnel as witnesses. The jury clerk testified that approximately two weeks earlier, during the trial, two to four jurors approached her, saying they had overheard two other jurors discussing the case. The jurors who reported the incident apparently confronted the two prematurely deliberating jurors. The jury clerk reported the incident to the court's deputy clerk who immediately reminded the entire jury of their obligation not to discuss the case until the official jury deliberations began. After the initial report, there was no evidence suggesting any other premature deliberations took place.

Additionally, during a cellphone conversation, presumably with a non-juror, one of the jurors spoke about the trial. The judge's law clerk heard the juror refer to trial events as a "soap opera" and "freak show," or similar words, and may have heard the word "sleazy." No other jurors were in the area, and according to the law clerk, the juror did not appear to be receiving information about the trial. In another instance, the law clerk overheard the same juror say the words "not liable" into the phone, and the court reporter overheard the same juror make a third statement on another occasion, saying the words "order the defendant." In these last two instances, it was not clear if the juror was speaking about the trial. There was no evidence the juror ever received information from outside sources about the trial. There is also no evidence the judge learned of these communications or the premature deliberations until after the jury began their official deliberations. After hearing the testimony and arguments from the parties, the judge decided not to investigate further.

Competing interests are implicated by a judge's intrusion into jury deliberations. On the one hand, juror misconduct—including premature discussion of the trial and influences from extra-jury sources—may interfere with the juror's ability to fairly consider all the evidence after it has been presented. *See United States v. Resko*, 3 F.3d 684, 688–90 (3d Cir.1993) (providing reasons why premature deliberations are prohibited); *id.* at 690 (describing an extra-jury influence as "a far more serious threat" than premature discussions among jurors). On the other hand, "the secrecy of deliberations is critical to the success of the jury system," *United States v. Boone*, 458 F.3d 321, 329 (3d Cir.2006), and "a district court should be more cautious in investigating juror misconduct during deliberations than during trial," *id.* Accordingly, when a district court discovers substantial evidence of juror misconduct during deliberations, it may, at its

---

**2.** The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction to hear the appeal under 28 U.S.C. § 1291.

discretion, investigate the allegations.[3] *Id.*; *see also United States v. Kemp*, 500 F.3d 257, 301 (3d Cir.2007) ("[T]he legal standard is clear: a district court may investigate allegations of juror misconduct when presented with 'substantial evidence' of that misconduct" during deliberations; its response is reviewed for abuse of discretion.).

In this case, there was some evidence of juror misconduct in the form of the testimony about premature intra-jury deliberations and at least one extra-jury cellphone discussion. The court had instructed the jury: "I'm telling you don't discuss any evidence in this case until you have heard the closing arguments of the lawyers and the Judge's instructions on the law, then you can discuss it." The court also instructed, "You should not discuss this case or the witnesses or the evidence in any way among yourselves until after it's been turned over to you for your deliberation." The testimony supported the conclusion that a jury member provided casual commentary about the trial to a nonjuror in a cellphone conversation, but not that any jury member received information about the trial from sources outside the trial process. The evidence of premature jury deliberation revealed a departure from the preferred process, but it did not compel the conclusion that the jury or any of its members would be incapable of carrying out their duties. *See Resko*, 3 F.3d at 690 (writing that premature jury deliberations

violate "the proper *process* for jury decisionmaking," but provide "no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial"); *id.* at 695 ("[W]e are unwilling to assume the existence of prejudice because we are far less certain that premature deliberations will lead to prejudice in every, or nearly every, instance."). The District Court was in "the best position to evaluate what kind of investigation the circumstances demanded." *Kemp*, 500 F.3d at 302. Under the facts in this case, it was not an abuse of discretion for the court to conclude a further investigation was not warranted in light of the ongoing deliberations.

### III

■ Carey called two expert witnesses to testify at trial, Mr. Leksell and Mr. Rapperport. These witnesses supported Carey's theory that an electrical source may have ignited the fire. Carey contends the District Court erred by allowing the prosecution to ask his expert witnesses questions about the report of James M. Tsikalas, a prosecution expert who was not called to testify.[4] Tsikalas had investigated the scene two days after the fire, whereas the defense experts did not conduct an examination until several months later. The reports of the defense experts referred to the Tsikalas's report extensively, and their testimony made clear they had read and reviewed the Tsikalas report,

---

3. Because of the importance of jury deliberations, the limits of a district court's discretion are different when evidence of misconduct arises during trial than when the evidence arises during deliberations. *Compare Resko*, 3 F.3d at 690, 694 (holding that upon a showing of "unequivocal proof" of jury misconduct discovered during the trial, a district court may not abrogate its duty to find, as a factual matter, whether the jury has been prejudiced), *with Boone*, 458 F.3d at 329 ("[W]here substantial evidence of jury misconduct …

arises during deliberations, a district court may, within its sound discretion, investigate the allegations through juror questioning or other appropriate means.").

4. We review the District Court's evidentiary rulings for abuse of discretion. *United States v. Olhovsky*, 562 F.3d 530, 543 (3d Cir.2009). To the extent the evidentiary rulings depend on interpretations of the Federal Rules of Evidence, we exercise plenary review. *Id.*

accepting some of its conclusions, including the determination of where the fire started, and rejecting others, such as the cause of the fire. Part of the reason the experts had rejected Tsikalas's conclusion about the cause of the fire, the prosecution claimed at trial, was they had accepted facts as told to them by Carey, months after the fire, about the location of a milk cooler receptacle and where it was plugged in.

The two defense experts testified four days apart. The day after the second defense expert testified, the District Court issued a limiting instruction, explaining to the jurors that the information contained in the Tsikalas report should only be used to assess the testimony of defense experts Leksell and Rapperport.

> Federal Rule of Evidence 703 provides,
>
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

And Rule 705 states,

> The expert may testify in terms of opinion or inference and give reasons

therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

These rules "place[ ] the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir.2002) (*citing Ratliff v. Schiber Truck Co.*, 150 F.3d 949, 955 (8th Cir.1998)). Both of Carey's expert witnesses discussed the Tsikalas report in their own expert reports and in their testimony at trial. The defense experts, who did not review the scene of the fire soon after it occurred, based many of their opinions on the facts found by Tsikalas's early investigation and included in his report.[5] Accordingly, the Tsikalas report was a basis for the opinions of the defense experts. *See Ratliff*, 150 F.3d at 955. The defense experts did not agree with all Tsikalas's conclusions, but their disagreement does not negate their reliance on his report. *See id.* (noting the disagreement between a testifying expert and the author of the report relied upon by the testifying expert).[6] In this case, identifying the areas of disagreement was important. In areas in which they disagreed with Tsikalas, the prosecution showed, Leksell and Rapperport relied on facts they learned from Car-

---

5. According to Carey's own experts, Tsikalas's report was a type reasonably relied upon by experts in the field because it occurred soon after the fire. *See* Fed.R.Evid. 703.

6. Defendant contends we should follow *In re Hanford Nuclear Reservation Litigation*, 534 F.3d 986, 1011–12 (9th Cir.2008), which he believes dictates a result different from the one we reach. In *Hanford Nuclear Reservation Litigation*, a plaintiff expert witness, Dr. Davies, relied on dosage estimates of Dr. Ruttenber, an expert witness who did not testify,

but Dr. Davies never read or relied upon the deposition transcript of Dr. Ruttenber. *Id.* On cross-examination, a defense lawyer asked Dr. Davies about testimony Dr. Ruttenber gave in his deposition—testimony that demonstrated a disagreement between Dr. Davies and Dr. Ruttenber. *Id.* at 1012. The court concluded it was error to allow the questioning about Dr. Ruttenber's deposition testimony. *Id.* This case differs from *Hanford* because the defense experts read and relied on a single source: the Tsikalas report.

ey. And Carey's credibility about the cause of the fire was a central issue in the trial. Accordingly, identifying the areas of disagreement helped focus the jury on facts underlying Leksell and Rapperport's conclusions that were suspect. The District Court did not abuse its discretion by allowing the prosecution to question the defense experts about these facts and bases of their opinions. Moreover, the court's limiting instruction cautioned the jury against using the information from the Tsikalas report improperly, and it was not untimely.[7]

## IV

■ Finally, Carey challenges the admission of a letter the Erie Insurance Group sent him in August 2002. The letter denied insurance coverage, stating that Erie Insurance had concluded the fire was set by an insured. The parties stipulated at trial that the letter was not being offered for the truth of the matter asserted—that Carey or his wife set the fire. Carey contends on appeal that the letter's reference to the cause of the fire was prejudicial. Because an Erie Insurance

employee had already testified that the company denied Carey's claim, he contends, the evidence should have been excluded.[8]

Carey was on trial for arson, using a fire to commit a felony, and for insurance fraud. He allegedly made fraudulent statements both before the denial-of-coverage letter and after, during civil litigation against the insurance company. His statements about the cause of the fire were central to these charges of fraud.[9] Early on, Carey had claimed a neighbor or his wife or son had caused the fire. But after submitting his proof of claim, Carey began to suggest the fire may have been caused by an electric malfunction. And after receiving the denial-of-coverage letter, Carey asserted the electric-malfunction theory with more certainty. He began supplying new information to support the theory—including suggesting flammable liquids were stored nearby, which he had previously denied. The evolution of Carey's story shifted the focus away from him by identifying a non-human cause of the fire. The letter helps explain why he would

7. The parties also contest whether references to the Tsikalas report in the prosecution's closing argument were improper. They were not. Not only did the prosecution's closing argument limit the references to the Tsikalas report to the purposes for which the court had allowed during Leksell and Rapperport's testimony, it also reminded the jurors of the court's limiting instruction: "While we're not asking you to consider the insurance company's findings and conclusions in this case with respect to the determination of guilt, as the Court's instruction clearly indicates, you can consider the fact that Rapperport and Leksell viewed this apparently important information about the location of electrical conductors and discounted it completely in favor of what the defendant told them" about the location of the milk cooler receptacle.

8. Ordinarily, we review evidentiary rulings for abuse of discretion. See supra note 4.

The District Court here overruled Carey's objection to the evidence, but because its reasons for doing so are not apparent, we exercise plenary review. See United States v. Sriyuth, 98 F.3d 739, 745 & n. 9, 747–48 (3d Cir.1996) ("Where ... the district court fails to explain its grounds for denying a Rule 403 objection and its reasons for doing so are not otherwise apparent from the record, there is no way to review its discretion." (internal quotation marks omitted)). We consider whether the probative value of the letter was "substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403.

9. Mail fraud requires the prosecution to show (1) a scheme or artifice to defraud, (2) participation by the defendant with specific intent to defraud, and (3) use of the mail in furtherance of the scheme. United States v. Copple, 24 F.3d 535, 544 (3d Cir.1994).

change his story: to shift attention away from himself so he could recover the insurance proceeds. Evidence that Erie Insurance denied the claim, without explaining the reason, would not have been probative. Independent of the truth of the matter asserted, the letter helps explain the pattern of false statements, which is relevant to establishing the scheme to defraud and also Carey's mental state.[10] The evidence's probative value was "not substantially outweighed by the danger of unfair prejudice." *See* Fed.R.Evid. 403. Moreover, the parties' stipulation that the evidence was not admitted for the truth of the matter asserted further limited any possible prejudice to Carey.

### V

For the foregoing reasons, we will affirm the judgment of the District Court.

---

10. Carey also contends the letter was not relevant. But as noted in the text, it had a "tendency to make the existence of any fact that is of consequence … more probable … than it would be without the evidence." Fed. R.Evid. 401.

