# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 14, 2003 Session

## STATE OF TENNESSEE v. DAVID G. HOUSLER

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 39217     John H. Gasaway, III, Judge**

---

**No. M2002-00419-CCA-R3-CD - Filed February 27, 2004**

---

A Montgomery County jury convicted the Appellant, David G. Housler, of four counts of felony murder. Housler's convictions stem from the robbery of a Clarksville Taco Bell and the execution-style murders of four of its employees. Following a sentencing hearing, the trial court imposed four consecutive life sentences. Housler appeals, presenting the following issues for our review:

(1) Whether his confessions were properly admitted into evidence when the State and the trial court knew the confessions were false and unreliable;

(2) Whether the State committed prosecutorial misconduct by using the recanted testimony of Robert Eastland, Robert Dawson, and Michael Miller and by failing to inform defense counsel or the trial court that Jeremy Thompson had recanted his statement;

(3) Whether he is entitled to a new trial based upon the newly recanted testimony of Larry[1] Underhill;

(4) Whether the trial court erred in denying a new trial when a juror fell asleep during the trial;

(5) Whether the Mathews time-line proves his innocence;

(6) Whether the State prosecuted Housler and Courtney Mathews[2] under inconsistent theories; and

---

[1] The Appellant refers to the witness as William Underhill. Because the witness stated his name as "Larry G. Underhill" and "Larry Gene Underhill, Senior," we will use the name Larry, when appropriate.

[2] On January 12, 1996, the State moved to join the indictments of the Appellant and Courtney Mathews for trial. However, no disposition of this motion is apparent from the record.

(7)  Whether consecutive sentencing was proper.

After review, we find no error of law requiring reversal.  Accordingly, we affirm Housler's convictions and the imposition of four consecutive life sentences.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Michael E. Terry, Terry & Gore, Nashville, Tennessee, for the Appellant, David G. Housler.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Kim R. Helper, Assistant Attorney General; Robert "Gus" Radford, District Attorney General Pro Tem, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

On January 30, 1994, Kevin Campbell, Angela Wyatt, Patricia Price, and Marcia Klopp were working the early morning shift at a Taco Bell in Clarksville.  According to John Ballard, a shift manager at the Taco Bell, when he stopped by the drive-thru window at approximately 1:45 a.m., the employees were engaged in normal closing activities.  Klopp told Ballard that they had been very busy and had been unable to close the drive-thru window until 1:30 a.m.

When Ballard arrived later that morning at approximately 7:20 or 7:25 a.m., he noticed that the employees' cars were still in the parking lot.  After unlocking the main entrance, Ballard entered the Taco Bell and saw "a dirty line and a body towards the back end of the building in the dish area."  Ballard returned to his vehicle and telephoned the police.  He then circled the Taco Bell and noticed cardboard in the drive-thru window.

Detective Tony Blakely, a patrol officer at the time, was the first to arrive on the scene.  Blakely, along with another officer, checked the building to make sure no one was inside.  Blakely first checked the men's restroom area, where he found the body of Kevin Campbell.  The second victim, Angela Wyatt, was nearby under a stainless steel sink.  A few feet away from Wyatt's body was the body of the third victim, Patricia Price.  Blakely then exited the restroom area and proceeded to the office of the restaurant.  Directly outside the office, he discovered the body of the fourth victim, Marcia Klopp.  All of the victims were dead from multiple gunshot wounds.

Upon further examination of the men's restroom, Blakely observed a disrupted ceiling tile "that looked like it was moved for opening." The tiles were located approximately "ten steps" from the body of Kevin Campbell. T.B.I. forensic specialist Sandra Poltorack Evans arrived at the Taco Bell to aid in the investigation. Evans later confirmed that fingerprints on the vent near the ceiling tiles belonged to Courtney Mathews. Courtney Mathews was also employed at the Taco Bell and had been working at the restaurant for "approximately ten to fourteen days" prior to the robbery and murders.

The office safe had been broken into, apparently after the dial was shot, and some, but not all, of the safe shelves were disturbed. According to Evans, two different guns, a shotgun and a .9 millimeter, had been used to shoot the safe. Upon a search of the Taco Bell premises, a "Federal two and three quarter inch lead rifle slug shot shell case," an "unfired Federal two and three quarter inch lead rifle slug shot shell," and lead fragments from the slug were found inside. Twenty-four cartridge cases, all fired from a .9 millimeter, were also recovered. Eight bullets that were also found came from the same .9 millimeter as the cartridge cases. Similarly, bullet fragments recovered during the autopsies of the victims matched the same firearm.

An audit by then team unit manager, Sherry Underwood, revealed that $2,967.68 had been taken from the store. Underwood explained that the paycheck verification report showed that Courtney Mathews clocked in to work at 2:10 p.m. on January 29, 1994, clocked out for a break at 7:39 p.m., clocked back in at 8:12 p.m., and ended his shift at 9:11 p.m. Underwood testified that company policy prohibited entry to the store by anyone once the doors to the restaurant were locked for the evening. The only exception was to open the door to allow an employee to leave. However, Underwood agreed that the policy could be violated by the employees working at the time.

On the day of the murders, David Lee Rose was working maintenance at the McDonald's near I-24 in Clarksville. While he was emptying the trash, he discovered .12 gauge shotgun shells, .9 millimeter shells, change in wrappers, a black wallet, and a black leather glove. He also disposed of two half-eaten hamburgers that were in the bag with the other items. Rose took the shells and change home with him. He did not keep the glove or the wallet because there was no money or identification in it. When Rose learned about the murders, he returned the shells to his store manager.

Officer John Hunt of the Clarksville City Police Department searched for evidence "all along the interstate." At the Red River Bridge on I-24, Hunt, along with Detective Tim Saunders, found "some clothing garments throwed (sic) over the bridge, latex gloves – pieces of latex gloves, a pair of blue pants, [and] a Burger King bag." One of the clothing items was a black jacket. On the jacket was the blood of the victim Kevin Campbell, which was confirmed by DNA analysis. Also, plastic fragments taken from the coat were similar to the plastic blown off the safe.

Following police investigation, Courtney Mathews was developed as a suspect in the robbery and murders. A search of Mathews' car was conducted, during which a bowling bag containing $2,576 and a woman's purse containing several credit cards in the names of Courtney Mathews and

Kendra Corley were found. T.B.I. Agent Anthony Clark searched Mathews' home on Ryder Avenue. On February 2, 1994, Clark recovered several bullet fragments and unspent rounds from Mathews' home. On February 5th, a .25 caliber round was found outside Mathews' home. T.B.I. forensic scientist Dan Royse testified that a cartridge case and bullet fragments recovered from Mathews' home were fired from the same .9 millimeter as the cartridges and bullets discovered inside the Taco Bell and the bullet fragments recovered from the victims during their autopsies. After comparing the shotgun shell remnants from the Taco Bell to the ammunition recovered at McDonald's, Royse stated that they were all the same type of ammunition. Believing that Mathews obtained his shotgun from Shawn Depto in Pennsylvania, Royse compared the shells provided by Depto and determined that the shells had the same markings as those recovered at McDonald's and the one from Taco Bell. On November 21, 1995, a plastic bag containing shells and parts of a Winchester shotgun was found behind Mathews' home. After reassembling the shotgun, Royse's testing revealed that the Taco Bell shell was fired from the same gun. The shells provided by Depto and recovered from McDonald's also matched.

Jelaine Walker worked at Taco Bell with Mathews. She testified that Mathews left the Taco Bell around 9:00 p.m. on January 29th. About an hour or so later, Walker observed Mathews "at the trash can that's in the dining room right next to the counter, and he had the door of the can open and he was knelt down at the trash can." Mathews said to Walker, "I am gone, you don't see me."

At the time of the murders, Carl and Shawntea Ward shared the home on Ryder Avenue with Mathews. According to Carl Ward, Mathews arrived home about 7:30 p.m. on the night before the murders and went into his room. Ward observed Mathews break down a shotgun and get a .9 millimeter and a .22 or .25 and place them in "a little black book bag, [with] shells and everything and was preparing to leave." Mathews also took a bowling bag and some white latex gloves with him. Ward handled the .9 millimeter gun and then wiped it down pursuant to Mathews' instructions. Ward testified that, when Mathews left the house, "He had clothes on top of clothes. From what I remember, he had two layers of clothes on. He had on like Miami Hurricane colors, sweat suit, jogging suit. And then he had on black pants and a white shirt with a tie and a black three-quarter coat." As he left, Mathews stated that they would not see the clothes again. Ward identified the coat found under the Red River Bridge as the one that Mathews was wearing that night. According to Ward, on January 30th, Super Bowl Sunday, Mathews cried. The following Wednesday, Mathews attempted suicide. On this evening, Mathews told Ward, "I ain't shit. I killed four people." Between the Sunday of the murders and the Wednesday Mathews attempted suicide, he conveyed to Shawntea Ward the following account of events:

> Well, he told me that whoever did it, they went into the Taco Bell before it closed. They went into the men's bathroom and climbed into the ceiling, waited until the store closed. They came down and it is not normal for all the workers to be in one area and he said they killed two people in the front of the store and two in the back. And then they proceeded to take the money and he said they didn't get all the money because the drop box was still at the drive-thru window and it had a clipboard sitting

over the top of it, but you could see the money sticking out and he said they only got into three compartments of the safe, which it was six compartments.

Shawn Peghee worked with Courtney Mathews at Fort Campbell in the mailroom. On the Friday before the murders, Mathews asked Peghee questions about the safe in the mailroom and whether one would be able to get inside the safe if he shot it. According to Peghee, when Mathews was getting ready to leave the mailroom, "he sort of looked back at me with a smile on his face, sort of a smirk and he said something big was going to happen that weekend."

During the time that Mathews worked at Taco Bell, he asked Assistant Manager Deann Rivaf if anything was stored in the ceiling. Rivaf also recalled an incident where Mathews was supposed to be cleaning the men's restroom, but the supplies were outside the door.

In May of 1993, Fitz Dickson, who had known Mathews for eleven years, purchased a .9 millimeter gun for Mathews. When Dickson saw Mathews on the day of the robbery and murders, Mathews was "crying and depressed."

During the investigation, Attorney General John Carney was informed that the Appellant had information concerning the Taco Bell robbery and murders. On March 21, 1994, the Appellant was interviewed at the Criminal Justice Complex in Clarksville. During this interview with T.B.I. Agent Jeff Puckett, the Appellant admitted to meeting Courtney Mathews at a trailer in Oak Grove, Kentucky on January 21, 1994. He remembered that Mathews said he had a place to rob and "we'll go in and won't leave any witnesses." According to his statement, the Appellant then asked Mathews when this would happen, and Mathews told him to read the papers. He then reported that he encountered Mathews in jail and remembered him from the party at the trailer. According to the Appellant, Mathews stated he committed the Taco Bell murders and giggled. Given the information the Appellant revealed in this interview, including that Mathews talked about "187'ing the employees" or "not leaving any witnesses," Attorney General Carney believed that the Appellant "could possibly be a witness for the State in the case against Courtney Mathews." Discussions ensued with the Appellant's attorney, Larry McMillian. In exchange for the Appellant's cooperation and testimony against Mathews, the Appellant's bond was reduced on an unrelated aggravated robbery charge and the charge was to be reduced to robbery. The Appellant was released on bond and returned to Kentucky.

Carney and Assistant Attorney General Steven Garrett met with the Appellant again on October 11, 1995. Concerns were raised because, contrary to the Appellant's prior statement, Sulyn Ulangca could not provide an alibi for the Appellant on the morning of the robbery and murders. According to Carney, the purpose of this meeting was "[t]o try to clear up I think some inconsistencies in some statements and to confront him with some information that we had and to try to get to the truth as to whether or not he was actually a witness in this case or was he a defendant." During the interview, the Appellant gave a statement reporting the following details. The Appellant stated that, during a party at the trailer the week before the Super Bowl, Mathews said he was going to rob the place where he worked because he needed the money. The Appellant also

stated that "the plan was to go down there on a weekend late at night and tell the manager that he had left behind his billfold or lost his billfold inside the Taco bell and that would be the way to get in[.]" Furthermore, the Appellant stated that "he gassed Courtney Mathews up and he (Mathews) . . . didn't have the balls to go down there and rob the place, but that if he grew them, he (the Appellant) would go with him." Also, Mathews said he was going to "187 them," meaning kill them. On the night before the robbery and murders, the Appellant gave Mathews a ride to the Taco Bell around 11:00 p.m. The Appellant stated Mathews had a .9 millimeter pistol at the time, but he gave varying accounts of its disposal following the commission of the crime. Carney testified that the Appellant stated he was remorseful because "he had encouraged Mathews not to leave any witnesses." Based upon his statements, the Appellant's status changed from witness to suspect because if he acted as a lookout he would be an accomplice and could be charged with murder. Because Carney believed the Appellant was providing necessary information in "dribbles," he allowed him to go home and return the following Monday.

The Appellant was unable to return the following Monday due to car trouble. Ultimately, the Appellant returned on October 19, 1995. On this date, the Appellant entered into a proffer agreement with the State, wherein he would plead guilty to conspiracy to commit murder and robbery and receive an effective fifteen-year sentence, as a Range I standard offender. The negotiated plea was conditioned upon the Appellant's agreement that he would aid the police in their investigation of the Taco Bell robbery and murders by providing truthful testimony. In compliance with this agreement, the Appellant gave another statement, in which the following details were developed. He met Mathews at the trailer in Oak Grove about a week prior to the murders at Taco Bell. At the party, Mathews, the Appellant, and Charlie Brown talked about crimes each had committed. Mathews brought up the idea of robbing the place where he worked. Mathews said he would go in and leave no witnesses. The Appellant and Brown told Mathews that he (Mathews) would not commit the crime but, if he would, the Appellant would go with him. When the Appellant asked Kevin "Red" Tween if he knew about the plan, Tween responded, "[W]hatever, whenever." Melanie Darwish then approached the Appellant and said she was in for another "Bonnie and Clyde ride." The night of January 29, 1994, Tween told the Appellant to get some ammunition, and the Appellant visited someone called "Hippie Dude." The Appellant drove his white Tracer to Taco Bell, and Darwish drove her red Tempo. When the group left, Tween was wearing a dark blue hooded jacket and blue jeans, and Mathews was wearing a black knee-length jacket. The group stopped at the Minit Mart for beer and cigarettes. On the ride to Taco Bell, Mathews told Tween to get the register, and he would take care of the safe. Upon arriving at the Taco Bell, they pulled up to the Taco Bell drive-thru window. Mathews exited the car and tapped on the window, and a heavy-set woman with brown hair came to the window. During this time, the Appellant saw Darwish's car in the mall parking lot. Tween then got out of the car and ran behind the dumpsters. The Appellant decided not to go in because he was fighting with his girlfriend, Sulyn Ulangca, and he pulled up parallel to the main double doors. The Appellant saw Mathews and the woman walk toward the counter area near the bathrooms. After about twenty minutes, he heard ten to fifteen loud pops from the other side of the building, and he then saw Tween run behind the Taco Bell toward the dumpsters. Next, he saw another person exit the Taco Bell and run in the direction of the dumpsters. He then put the car in gear and drove across the bridge. He stated that Darwish drove the getaway

car, and he was the lookout. Following a quick conversation with Tween and Mathews in the Dingo Boot parking lot, the Appellant returned to the trailer. Tween and Darwish arrived at the trailer about thirty minutes later without Mathews. He asked where his thirty percent cut was, and Tween said that Mathews would be over later. Tween also said that Mathews shot them in the head gangster-style. According to the Appellant, he left his car on the road where Jennifer Ellis lived because he thought it would be connected to the murders. It was his understanding that it was later impounded by the police department. The Appellant stated he did not see Mathews again until they met in jail.

The Appellant's statements could not be confirmed by Sulyn Ulangca. When Ulangca returned to Tennessee to confront the Appellant, he did not want to see her and confessed to implicating an innocent person. The Appellant was informed that he had breached the agreement and that the agreement was going to be revoked. The Appellant then ran from the room.

Subsequently, on November 7, 1995, the Appellant was charged with four counts of premeditated murder, four counts of felony murder, and one count of especially aggravated robbery. The State filed a notice of intent to seek the death penalty. The State later withdrew its notice and filed notice of intent to seek life without parole. On September 3, 1997, the State obtained a superseding indictment, which charged only four counts of felony murder. The trial was held from November 12th through the 21st of 1997. Relevant portions of the testimony presented at the Appellant's trial follows.

Michele Antaya testified that, on January 29, 1994, at approximately 11:00 or 11:15 p.m., she stopped at the Taco Bell drive-thru window. According to Antaya, she saw a black male walk from behind the dumpster towards her car. She described him as between five nine and five eleven, stocky, and with a short hairstyle shaved on the sides. She testified that he was wearing a dark jacket with a hood and dark pants.

Yownada Maurizzio went through the Taco Bell drive-thru about 1:10 or 1:15 a.m. on January 30, 1994. She observed a black male speaking with a black female inside the restaurant.

Frankie Sanford testified that he was at the Taco Bell drive-thru about 1:30 a.m. on January 30th. He observed Mathews, dressed in his Taco Bell uniform, inside the restaurant.

Jacqueline Dickinson was eating pancakes at G's Pancake House near the Taco Bell on January 30th. She left G's Pancake House around 2:35 to 2:40 a.m. She stopped at a light in front of the Taco Bell and looked into the restaurant, where she observed a white male at the counter looking towards the Long John Silver's lot next door. According to Dickinson, the man was wearing "a long green jacket that reached past his buttocks" that "had a big hood attached to the back, the same color, and he had on a darker pair of jeans." She described the man as "medium built, around five nine to six foot. . . . He had short hair brown military style haircut." She also observed a white vehicle in the parking lot "facing inward towards the building." The car was not in the same position as the white car shown in the crime scene photos, which was a victim's vehicle.

-7-

Damien Cromartie was looking for taco sauce on the morning of the murders, and he stopped at the Taco Bell around 3:00 a.m. He observed a few vehicles in the parking lot, and a brown or burgundy sedan parked in the Two Rivers Mall parking lot behind the Taco Bell. When he pulled up to the drive-thru window, there was a large piece of cardboard in the window. According to Cromartie, he saw the silhouettes of two, maybe three, people moving around inside the Taco Bell.

Twenty-Third Judicial District Drug Task Force Agent Bill Hudspeth testified that, between 2:00 and 2:30 a.m. on January 30, 1994, he was driving home from Stewart County to Cheatham County. Near the vicinity of the Taco Bell, he saw a white male run diagonally in front of his car. The male ran from an area behind the Taco Bell across the road towards the muffler shop. Hudspeth described the male as "between five nine and six foot tall. His hair was short, over the ears on the sides and stocky build[.]" According to Hudspeth, another white male with short hair, stocky build, and a little taller than the other individual was standing near the muffler shop.

Mark Jolly testified that, between 2:30 and 3:00 a.m. on January 30, 1994, he was in the Shoney's parking lot across the street from the Taco Bell, when he "heard a couple of loud bangs" and saw "a man running from the back of the Taco Bell over by the Two Rivers Mall." According to Jolly, the man was a Puerto Rican or a light-skinned black male, wearing shorts, and carrying "something rolled up in a brown bag" in his left hand. After he saw the man, Jolly observed "the lobby lights in the Taco Bell flicker[] on and off two or three times."

Allen Ceruti testified that he passed by the Taco Bell between 4:20 and 4:30 a.m. At this time, he observed a black male standing at the open back door.

Charlie Brown testified that Mathews and the Appellant were both at a party together at the trailer in Oak Grove, likely on January 21st. During his testimony, Brown recanted a statement he made in November of 1995, wherein he said that he heard Mathews talking about robbing the place where he worked.

Melanie Darwish testified that she may have lent her car to the Appellant on the night of the robbery and murders, although she was not sure. According to Darwish, she was at home in bed on that night. Darwish confirmed that Mathews had been at a party at the trailer; however, she did not remember the Appellant being there.

Lopez Gaddes, a convicted drug trafficker, was in the Montgomery County Jail with the Appellant in 1994. While incarcerated, the Appellant told Gaddes that he knew Courtney Mathews and that he, Charlie Brown, and Mathews had conversations about robbing the Taco Bell. According to Gaddes, the Appellant told him that the first conversation about the robbery took place at a party a week or two before the murders. The Appellant also told Gaddes that the group again talked about committing the robbery at the barracks. When Gaddes asked the Appellant if he was scared, the Appellant responded that he was not because "Courtney was the trigger man."

Jason Carr testified that he was incarcerated with the Appellant in the Montgomery County Jail during March of 1994. During a card game with the Appellant and Charlie Brown, one of the two men stated, "David Housler's car was the one that was used in the getaway of Taco Bell."

Larry Underhill, another inmate, testified that the Appellant told him he was at the Taco Bell and that he was the one that killed the employees. Underhill said that the Appellant told him the victims were shot execution-style.

Convicted felon Christopher Ester frequently visited the trailer in Oak Grove. Ester testified that he saw Mathews at the trailer on January 29, 1994. Mathews talked about the robberies he had committed. According to Ester, Mathews and the Appellant had "a little conversation" that night. Ester testified that Mathews left the trailer around 12:30 or 1:00 a.m. and that the Appellant left about 2:30 or 3:00 a.m. after he and Ulangca got into an argument. The Appellant was supposed to call and let the group know his whereabouts, but he never called.

Orlando Gill also frequented the trailer. He believed he met Mathews the weekend before the murders, when Kendra Corley brought Mathews to the trailer. He observed the Appellant and Mathews engaged in a conversation in the kitchen "for a time."

Hector Ortiz also saw Mathews at the trailer with Corley prior to the murders. He likewise observed Mathews and the Appellant engaging in conversation. Ortiz was at the trailer on the night before the murders and saw the Appellant and Ulangca there. When he left around 1:00 a.m., neither the Appellant nor Ulangca were present in the trailer. When he returned to the trailer around 2:30 or 3:00 a.m., the couple still was not there.

Kendra Corley testified that Mathews did not go with her to a party at the trailer on January 21, 1994 because he was working. Corley stated that she did bring Mathews to the trailer on Saturday the 22nd, and they arrived between 9:30 and 10:00 p.m. Corley maintained that she did not go to a party at the trailer with Mathews on January 28th. According to Corley, Mathews gave her $255 in five dollar bills just prior to his suicide attempt. Corley also identified the black jacket as belonging to Mathews.

James Bowen testified that Corley brought Mathews to the party a week before the murders. Bowen overhead the Appellant and Mathews discussing a robbery at Taco Bell. According to Bowen, the Appellant and Mathews argued over who would "pull the gun and who was going to watch." Bowen testified that Mathews stated they would rob Taco Bell because "he worked there, it would be easier for them to do. He knew how many people would be there and when they closed." Bowen stated that he saw the Appellant and Ulangca go into a trailer bedroom about 2:00 a.m. and that they were still there when he woke up.

The Appellant testified in his own defense. He denied any involvement in the robbery and murders and asserted an alibi defense. At trial, Ulangca now claimed that the Appellant was with her on the night of the murders.

Following the conclusion of the evidence, the jury found the Appellant guilty as charged of four counts of felony murder and imposed a punishment of life imprisonment. After a sentencing hearing on December 12, 1997, the trial court ordered the Appellant's sentences to be served consecutively. Following extensive filings by both parties and three hearings on the Appellant's motion for new trial, proceedings on the motion were completed on July 3, 2000. On February 5, 2002, the trial court summarily denied the Appellant's motion for new trial. This timely appeal followed.

## ANALYSIS

### I. Use of Confession

The Appellant argues that "the State's use of [his] false confession constitutes prosecutorial misconduct and a constitutional violation." Furthermore, the Appellant contends that "the trial court's admission of the . . . confession constitutes reversible error." We disagree.

First, the Appellant made a voluntary statement to law enforcement officials, wherein he made admissions regarding his culpability in the robbery and murders and disclosed the circumstances surrounding the crimes. Prior to trial, an extensive hearing was held to determine whether the statements should have been suppressed because they were "not voluntarily made and [were] substantially false." In a detailed order, the trial court concluded that, "based upon the totality of the circumstances, that the statements challenged in the defendant's motion to suppress . . . were not the result of intimidation or coercion. Instead, the statements were the product of the defendant's free and deliberate choice and were voluntarily made." The trial court then proceeded to address the issue of the statements being substantially false.

The defendant's second contention is that the statements should be suppressed because they are substantially false. In support of this assertion, the defendant cites Mooney v. Holohan, 294 U.S. 102 (1935); Napue v. Illinois, 360 U.S. 264 (1959) and Miller v. Pate, 386 U.S. 1 (1967). Mooney and its progeny stand for the proposition that false evidence, including false testimony, may not be used to obtain a conviction. As this court noted at the suppression hearing, this line of cases addressed perjured testimony, knowingly false testimony about consideration received for cooperation, and physical evidence which is known to the state to be misrepresented (letting the jury believe paint stain is blood). Obviously, these types of evidence strike at the heart of what the Due Process Clause represents.

However, the instant case does not align itself with any of the above-listed categories. Instead, the statements given by the defendant may be considered a confession of some culpable act or if not a confession, at least an admission against interest. Tennessee law clearly contemplates that all or part of a confession or admission against interest may be false. The jury instruction concerning evidence of a confession (T.P.I. 42.12) instructs the jury that its duty is to judge the truth of the

confession. As such, the jury may accept or reject any portion of the confession it chooses. Likewise, the jury instruction concerning admissions against interest (T.P.I. 42.11) demands corroboration by other independent evidence to warrant a conviction.

The testimony offered at the suppression hearing indicates that part of the statements have admittedly been proven false by the state's investigators. However, this Court does not find that the introduction of these statements equates to presenting false testimony to a jury. Our law has built-in safeguards to prevent the state from obtaining a tainted conviction with such evidence. Brady v. Maryland and its progeny require the state to produce any evidence which is exculpatory. This requirement gives the defendant access to information he may find necessary to attack the truth or falsity of the statements. Similarly, the state must present independent corroborating evidence to support those parts of the statement or statements it believes are true.

This Court has already found, without regard to truth or falsity, that the statements were voluntarily made. The determination of the truth or falsity of the statements shall remain with the jury.

The reasoning of the trial court in admitting the evidence is sound. The record supports the conclusion that the statements were voluntarily made, and the determination of the truth or falsity of the confession was properly left to the province of the jury.

Second, the Appellant contends that a confession should not be tested solely by the corroboration rule when the confession is known to be false. In Tennessee, it is well-established that a conviction cannot be founded solely upon a defendant's confession. *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000) (citing *Ashby v. State*, 139 S.W. 872, 875 (Tenn. 1911)). Some corroborating evidence is required which, independently of the confession, tends to establish the *corpus delicti* of the offense charged. *Id.* However, where there is a confession, the corroborative evidence "need not be as convincing as the evidence necessary to establish a *corpus delicti* in the absence of any confession." *Ricketts v. State*, 241 S.W.2d 604, 606 (Tenn. 1951). The corroborating evidence is sufficient to sustain a conviction if "it tends to connect the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little consideration." *Id.*; *see also Smith*, 24 S.W.3d at 281. Moreover, we note that all elements of the *corpus delicti* may be established by circumstantial evidence. *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). The Appellant admits that his statement, even if only minimally, was corroborated. If the confession was corroborated, then it is not completely false.

While portions of this confession may have been untrue, the Appellant's involvement in this crime was corroborated by other independent evidence presented at trial. Several witnesses testified that the Appellant and Mathews were together on at least one occasion at the Oak Grove trailer, which corroborated the Appellant's account of their conversation about the robbery. The Appellant stated that Kevin "Red" Tween was to accompany Mathews inside the Taco Bell. In his statement,

the Appellant reported that, at the time of the robbery, Tween "was wearing a big dark blue hooded Adidas jacket, black and white shell toe Adidas tennis shoes, blue jeans and black T-shirt with a clown on it." Jacqueline Dickinson testified that she saw a white male inside Taco Bell wearing a hooded green jacket and dark blue jeans around 2:35 or 2:40 a.m. Also, in his statement, the Appellant said he drove his white Tracer to Taco Bell. Dickinson observed a white car at the Taco Bell, which was "facing to the back parking lot" and which was not the victim's vehicle in the crime scene photos. The Appellant stated that Mathews was wearing "a black cloth knee length jacket," which was consistent with other witnesses' accounts and the recovered jacket. According to the Appellant, Melanie Darwish's red Tempo was parked in the mall parking lot behind the Taco Bell. Damien Cromartie testified that a brown or burgundy sedan was parked in the Two Rivers Mall parking lot. Cromortie also testified that he saw at least two people inside the Taco Bell, when he pulled up to the drive-thru window about 3:00 a.m. The Appellant stated that both Mathews and Tween went inside. Additionally, the Appellant reported that a "heavy-set woman white female with brown hair come to the drive-up window." This description was consistent with the characteristics of the victim Marcia Klopp. Finally, the Appellant observed Tween running behind Taco Bell after he heard a "loud bang." Although their descriptions varied, both Bill Hudspeth and Mark Jolly saw a man running near the Taco Bell around 2:30 a.m. The evidence was sufficient to corroborate the Appellant's confession.

The Appellant asserts that the "statements are contrived, concocted, unreliable, and wholly inconsistent with known and accepted facts[.]" Reliability of the confession was a determination for the jury.

> A confession being admitted, its weight is of course a matter for the jury. That is, the jury is to determine whether defendant made the confession and whether the statements contained in it are true. To aid them in resolving these questions the jury may hear evidence of the circumstances under which the confession was procured.

*Wynn v. State*, 181 S.W.2d 332, 333 (1944); *see also State v. Pursley*, 550 S.W.2d 949, 950 (1997). At trial, the Appellant explained his reasons for making the statements, including his strong desire to get out of jail on a reduced bond. The Appellant also presented the testimony of Charlie Brown as to how the statements were formulated. The jury, as was its prerogative, disagreed with the Appellant's assertion that this confession was false and he was not involved in these crimes. Accordingly, the Appellant's claim that the State is guilty of misconduct and that the trial court erred by admitting the confession is without merit.

## II. Recanted Testimony

Next, the Appellant contends that the State committed prosecutorial misconduct by its "persistent and deliberate use of recanted testimony" and its failure "to inform the defense that certain witnesses had recanted their testimony." Within this section, the Appellant argues first about

-12-

the testimony of Robert Eastland, Robert Dawson, and Jeremy Thompson, and then about the testimony of Michael Miller. We will address these arguments in turn.

## A. Eastland, Dawson, and Thompson

With regard to Eastland, Dawson, and Thompson the Appellant argues that:

Having known about these witnesses for years, the State obtained statements from them within days of trial. Concerned about the eleventh hour production of these witnesses, the Court limited their use to rebuttal. For at least two days prior to their testimony, the witnesses informed the State that they knew nothing about the Taco Bell murders, that Houlser had told them nothing about the Taco Bell murders, that anything said to them by Housler was not related to the Taco Bell murders, and recanted their early November statements.

The State called Eastland and Dawson in rebuttal; however, Thompson was not called to testify. The Appellant's argument is two-fold: (1) the State committed prosecutorial misconduct in presenting the recanted testimony of Eastland and Dawson and (2) the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), by failing to disclose the recantations of Eastland, Dawson, and Thompson to defense counsel or the trial court.

First, we conclude that Eastland and Dawson did not recant their trial testimony. The witnesses did not withdraw or renounce their statements but merely informed Attorney General Gus Radford that they would not testify for the State. At trial, the Appellant initially testified that he did not speak with Eastland concerning "redemption." He then stated that he may have spoken with him. In rebuttal and after a jury-out hearing, the State called Eastland to testify as to whether the Appellant talked about redemption during a trip to Clarksville. Eastland testified that he, Thompson, and the Appellant spoke about redemption. Dawson, although reluctant to testify, stated that the Appellant told him that "he had seen a lot of shit in his life." Thompson was not called to testify. Eastland and Dawson testified in accordance with their statements. Furthermore, Dawson acknowledged his statement was true. Because these were not inconsistent statements, the Appellant's reliance upon *State v. Mays*, 495 S.W.2d 833 (Tenn. Crim. App. 1972), and *State v. Steve Johnson*, No.02-C-01-9504-CC-00097 (Tenn. Crim. App. at Jackson, Feb. 27, 1997), is misplaced. The State did not use recanted testimony and, thus, this issue is without merit.

With regard to a *Brady* violation, the Appellant contends that the State should have informed defense counsel that Thompson recanted his statements and that, if the State had done so, he could have used Thompson to rebut the testimony of Eastland. Relief under *Brady* is not available unless the Appellant can establish that the evidence improperly withheld was material to the defendant. *State v. Edgin,* 902 S.W.2d 387, 389 (Tenn. 1995). In order to determine the materiality of undisclosed information, the reviewing court must ascertain whether in the absence of the information the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566 (1995). Thus, in order to

prove a *Brady* violation, a defendant must show "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

The Appellant has not shown that the information that Thompson recanted his testimony was improperly withheld from defense counsel. At the hearing on the motion for new trial, Thompson testified that, on the morning he was to testify for the State, he informed Attorney General Radford that his statement was not true. Thompson was listed as a witness, and the Appellant had complete access to this witness as he was a friend of the Appellant. Regardless, Thompson's testimony was not material to the Appellant. Eastland only testified about the Appellant's talk of "redemption." This was not a material issue in the prosecution of the Appellant. Eastland did not testify that this statement was in relation to the Taco Bell robbery or murders. We conclude that the Appellant has not shown that the evidence was material to the defense or that Thompson's testimony "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. at 434, 115 S. Ct. at 1566.

## B. Michael Miller

The Appellant argues that the State's use of Michael Miller as a witness constituted prosecutorial misconduct. We conclude otherwise. The proof established that Miller and the Appellant were inmates in the Montgomery County Jail shortly after the Taco Bell crimes. During their incarceration, the Appellant confided in Miller that he and others participated in the Taco Bell robbery and murders. Miller advised the authorities of this fact, resulting in a two-page signed statement to the T.B.I. detailing the Appellant's conversations with Miller. Approximately six weeks prior to the scheduled trial, Miller, who was then incarcerated in a Kentucky penitentiary, was contacted by the T.B.I. regarding his statement. Miller reaffirmed his prior statement to the T.B.I.

During opening statements on November 12, 1997, the attorney general made reference to Miller and the fact that he would be called as a State's witness. In the opening statement by the defense, defense counsel informed the jury:

> [DEFENSE COUNSEL]: I want you to remember what the Attorney General told you about Michael Miller. The Attorney General told you that Michael Miller was going to come in here and tell you that David Housler told him a whole bunch of things about this shotgun, and you remember plastic bag, where it was, and all of that? You remember that on November 12[th], you were told that. You remember that next week when we come back up here?

On the second day of trial, Miller was called to testify. Before taking the stand, Miller informed the attorney general that his March 1994 statement to the T.B.I. was false. The attorney general advised the court of this fact and that if a recantation occurred, he would ask that the witness be declared a hostile witness. No objection was entered by defense counsel. During his testimony, Miller denied that he had ever talked to the Appellant about the "Taco Bell murders." He admitted that he gave the statement to the T.B.I. but explained that he either made the facts up, read about the facts in the

newspaper, or was told what to say by the T.B.I. agent. Early into direct-examination, defense counsel posed an objection as to the attorney general's manner of impeachment. A bench conference was held. The record of this conference reflects that defense counsel's objections stemmed from the fact that "[the attorney general] has never asked this man what he said in the statement? If he puts that in, then he can say how did you know this? Why did you change - -." The trial court agreed with defense counsel's recommendations, which were followed by the attorney general during the remainder of direct examination. The State concluded its examination without introducing the witness' prior inconsistent statement or requesting that the witness be declared hostile. During cross-examination, defense counsel moved for introduction of the witness' signed statement as an exhibit and conducted an extensive line-by-line impeachment of its contents.[3] Upon conclusion of Miller's testimony, the trial court voiced concerns as to its use by the jury. Another bench conference was held, during which defense counsel suggested that the attorney general's actions in calling Miller to testify constituted reversible error because the State did not provide notice of his recantation to the Appellant. The attorney general responded that he had informed the court and defense counsel of the witness' potential for recantation upon learning of this fact. Moreover, the attorney general noted that, although the State learned of the witness' recantation that same morning, the testimony of Miller indicated that Miller had informed defense counsel investigators that he was recanting "two or three days" prior, during their visit with him at the penitentiary. Defense counsel responded, "He's right, that we interviewed this witness and this witness told us that his statement was not true, but as the witness testified, he had told the [T.B.I.] six weeks ago that it was true." The attorney general also asserted that he was disturbed by defense counsel's opening remarks to the jury which "challenged me to deliver on Miller," when he knew at the time that Miller would be recanting. With regard to the facts in dispute, the trial court found:

> THE COURT: . . . My recollection at the sidebar was that [the attorney general] wanted to - - brought to the Court's attention that the witness, Michael Miller, who he was about to call, may very well become a hostile witness and [the attorney general] was seeking to have him treated as a hostile witness under Rule 611, so that he could lead him.
>
> . . .
>
> And I so instructed Counsel to do that and Mr. Terry agreed that that's the way it ought to be done.
>
> At that point in time though, I don't suppose anyone knew - - first of all, whether he was going to say that his statement was false, or if he was going to say that, was he going to say that it was entirely false or only partially false?

---

[3]The State conceded at trial that portions of Miller's statement were possibly false; however, these statements were not inculpatory in nature and no questions were asked of the witness regarding these particular statements. In contrast, these statements were fully explored and capitalized on by the Appellant during his examination of Miller.

. . .

. . . [The attorney general] is correct, that after [he] finished examining the witness, then the cross examination by the Defense was to go over the statement again, line by line. So not only was there no objection from the Defense, the examination conducted by the Defense would act as a waiver in terms of complaining about the fact that the witness was allowed to testify.

Nonetheless, the trial court noted that it wanted to reflect further upon the question of whether a proper limiting instruction could be given under the circumstances or whether Miller's entire testimony should be stricken. Before recessing the jury for the day, the trial court instructed the jury as follows:

As a matter of law, the Court has ordered the testimony of Michael Miller stricken from the record. That means that the testimony of Mr. Miller must be disregarded by you in its entirety and treated as though you never heard it. If you have notes in your notebook regarding the testimony of Mr. Miller, I am now instructing you to separate those notes from your notebooks and tender those separated Miller notes to the Court.

You may not place any significance on either the testimony of Mr. Miller or draw any inferences from this instruction or this proceeding. If you will just take a moment and separate your notes from your notebook, if you have them? It may mean that you have a portion of a page that is separated from your notebook and I am sure you will be able to keep up with it.

The record indicates the jurors complied with this request.

Tennessee Rule of Evidence 607 allows a party to impeach its own witness, and Rule 611 allows the use of leading questions on direct examination of a hostile witness. Tenn. R. Evid. 607, 611(c). Moreover a party may impeach a hostile witness by asking the witness whether they previously made certain prior inconsistent statements. Tenn. R. Evid. 613(a), NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 6.13[2] (4th ed 2000). At trial there are limits on the State's power to impeach its own witnesses by presenting the witnesses' prior inconsistent statement. *See Mays v. State*, 495 S.W.2d 833 (Tenn. Crim. App. 1972). Impeachment cannot be a "mere ruse" to present to the jury prejudicial or improper testimony. *State v. Roy L. Payne*, No. 03C01-9202-CR-00045 (Tenn. Crim. App. At Knoxville, Feb. 2, 1993). In *United States v. Webster*, 734 F.2d 1191 (7th Cir. 1984), the court explained:

[I]t would be an abuse of [Federal Rule of Evidence 607], in a criminal case, for the prosecution to call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence–or,

-16-

if it didn't miss it, would ignore it. The purpose would not be to impeach the witness but to put in hearsay as substantive evidence against the defendant, which Rule 607 does not contemplate or authorize.

*Webster*, 734 F.2d at 1192.

At this juncture, we would note that a party may not be granted relief for an error by failing to take whatever action was reasonably available to prevent or nullify the harmful effect of the error. Tenn. R. App. P. 36(a). In this regard, the record reflects that, not only did the Appellant never object to the admission of Miller's prior inconsistent statement or request that it be stricken, but he facilitated its introduction by conducting a line-by-line examination of the statement. Moreover, it was the Appellant who moved for introduction of the statement into evidence. As found by the trial court, any objection to the prior inconsistent statement was waived.

Notwithstanding waiver, we elect to review this issue upon its merits. Central to this issue is whether the introduction of Miller's hearsay statement by the State to impeach its own witness was motivated solely by the desire to put the statement before the jury. The fact that the attorney general was not surprised by Miller's testimony at trial does not indicate bad faith. Rule 607 does not require that the party calling the witness be surprised before the witness can be impeached. Tenn. R. Evid. 607. As has already been observed, the attorney general's use of the statement was limited in scope, as opposed to the Appellant's, and focused primarily upon the Appellant's statements regarding the location of the discarded shotgun. The record reflects that the shotgun was located by law enforcement officers based upon information supplied in Miller's statement. As such, the attorney general explained that he was primarily attempting to lay the foundation for those officers and the forensic proof which was to follow.

Based upon the record before us, we are unable to conclude that the State's impeachment by use of the Appellant's prior inconsistent statement was employed for the primary purpose of placing before the jury evidence which was not otherwise admissible. *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1995). Indeed, the record reflects that the Appellant was equally interested, for his own tactical reasons, in placing Miller's testimony before the jury, as at times his testimony tended to damage the State's case. For these reasons, any examination under Rule 403, Tennessee Rules of Evidence, is unnecessary.[4]

Finally, we disagree with the Appellant's characterization of the attorney general's actions in calling Miller as a witness as "prosecutorial misconduct." The defense and the State were both equally aware of Miller's potential for recantation; however, it was the State who informed the trial court of this possibility. This issue is without merit.

---

[4] In this regard, we note that certain portions of Miller's testimony on direct-examination, *i.e.*, location of the shotgun, was corroborated by other witnesses. Furthermore, the testimony was stricken from the record following the Appellant's objection to the testimony, which only occurred after Miller's testimony was concluded and the trial court voiced its concerns as to its use. Therefore, we conclude that the Appellant suffered no prejudice from the State's examination of Miller.

### III. Testimony of Larry Underhill

The Appellant argues that "the trial court's admission of the testimony of [Larry] Underhill allowed the prosecution to introduce recanted false testimony and constitutes reversible error." He submits that:

> There is no doubt whatsoever that Larry Underhill's testimony was false, and that Underhill, by his own admission, has committed perjury. There is no doubt whatsoever that Underhill's testimony was significant to the State's case. Without the false testimony, the jury would not have been exposed to Eastland and Dawson, and to the State's rehash of the incredible tale at closing. Without the false testimony it is more than probable that the jury might have reached a different conclusion.

Prior to Underhill's testimony, the State informed the trial court that it was "not comfortable" with all of Underhill's testimony; therefore, the State planned only to question him about statements the Appellant made concerning redemption. The State believed the Appellant's talk of redemption could be corroborated by Robert Eastland. Defense counsel stated to the court that Underhill's statement was "full of lies." However, the trial court ruled that the decision on Underhill's credibility rested with the jury.

Underhill and the Appellant encountered each other while they were incarcerated in the Montgomery County Jail. Underhill testified to the following upon direct-examination:

A. Mr. Housler told me that he had done a terrible thing. He was crying in the middle of the night.

Q. What did you say?

A. I responded, I said David, do you want to talk about it? I first said what's wrong David? Do you want to talk about it?

Q. What did he say?

A. And David – again, I repeat, I've done a terrible thing. He said, Larry, I've lied to you – he said I lied to you about not being at the Taco Bell when the robbery and murders were committed.

Q. Did you say anything then?

A. Not that I recall, no sir.

Q. Then what did he say?

A. He said I was there at the time of the murders and he said not only was I there, I was the one that killed the employees there.

Q. Was he crying at that time?

A. He was crying and he was badly shaken, yes.

Q. What did he say then?

A. He asked me if I thought that God would forgive him for those sins? And I told him at that time, I said well – David, I really don't know, but I said you need to be saved. I think that you need to be saved first because I am not sure that God will answer prayer unless a person is saved. And then he asked me if I knew of any unforgivable sin? And I replied, I said David, the only one that comes to mind – this is based on my past teachings, would be blasphemy against the Holy Ghost or in other words, a total rejection of the existence of God or Jesus.

Defense counsel then went on to extensively cross-examine Underhill, concerning the details of this conversation and his history of crime, alcohol use, and mental health problems.

At the motion for new trial hearing, Underhill testified that, while at the time of trial he believed his testimony was accurate, he now believed that his conversation with the Appellant was a hallucination. Underhill stated that he encountered Courtney Mathews at the Turney Center following his testimony in the Appellant's trial. According to Underhill, Mathews told him that the Appellant was not involved in the Taco Bell robbery and murders, but Mathews was "going to let him swing." Underhill claimed that he sent a letter to Attorney General Radford reporting this conversation; however, Radford stated he never received such a letter. In sum, Underhill completely recanted his trial testimony.

Before granting a new trial on the basis of newly discovered recanted testimony, the trial court must find that: (1) it is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told. *State v. Ratliff*, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing *State v. Mixon*, 983 S.W.2d 661, 673 n. 17 (Tenn. 1999)).

In the case at bar, the trial court did not make any formal findings on the record. However, concerning the letter Underhill allegedly sent to Attorney General Radford, the trial court noted, "[A]t least if he had written it and Mr. Radford had received it that would be some corroboration that Mr. Underhill did what he said he did." Impliedly, the trial court was troubled with Underhill's credibility. We conclude that the trial court was not "reasonably well satisfied" that the new testimony given by Underhill was true. Furthermore, the Appellant has not met his burden that the

jury might have reached a different conclusion had the truth been told. Contrary to the Appellant's assertion, Underhill's testimony was not "material" or "significant." Underhill testified that the Appellant was the shooter, which was not the State's theory at trial. Also, the State only presented Underhill to elicit testimony concerning redemption, which was corroborated by another witness. Accordingly, we conclude that this issue is without merit.

## IV. Juror Misconduct

The Appellant contends that "[t]here is an incredible amount of evidence in this record regarding juror misconduct." Specifically, he argues that he is entitled to a new trial because a juror slept during trial and was, therefore, incapable of rendering a fair verdict.

This issue was raised for the first time in the motion for new trial. Apparently, Alternate Juror David Tanksley contacted defense counsel after the return of the guilty verdict to convey his concerns. At this time, Tanksley related that a juror, Bobby Martin, was regularly asleep throughout the trial. In support of his motion for new trial, the Appellant presented the testimony of Tanksley. Tanksley testified to the following:

> Q. . . . [D]id you observe whether or not [Mr. Martin] was sleeping for part of the trial?

> A. Yeah, he – well, I guess in the jury room and all that we'd make kind of jokes. And we'd even talk to him, say, man, you're going to get into a lot trouble for sleeping. You need to wake up and stay up.

> And while we're sitting in the jury panel – I mean the seats every once in a while, I think his name was Richard Davis, the other alternate, he'd nudge me and point over to him and I'd look over and observe him and he'd be nodded out.

> And a couple of the others down there would kind of look up and move their heads that way and, you know, you'd see him over there sleeping.

> . . .

> Q. And this pattern of sleeping, did it occur throughout the trial?

> A. Yes, it did. Even in – during breaks he'd, – you know, when we was in the jury room, I guess, recess room, he'd sit there and nod out. And we'd mess with him, you know, better wake up, you know, you better, you know, pay attention.

> We – some of us even made comments, you know, he's liable to get thrown off this trial because of it.

Q. So, he was – it was a persistent pattern? It was something that happened every day?

A. Yes.

The State, in rebuttal, provided the testimony of Juror Bobby Martin and the remaining eleven jurors and one alternate. Martin admitted that he "nodded off." Juror Jason Taylor testified that he observed Martin "being woken up prior to recess." According to Taylor, he only observed Martin sleeping on this one occasion. Alternate Juror Richard Davis testified that he did remember Martin napping during recess but did not remember Martin "taking a nap during the trial period."

The mere fact that a juror becomes drowsy for a short time is not of itself a ground for a new trial. *State v. Chestnut*, 643 S.W.2d 343, 346 (Tenn. Crim. App. 1982); *see also State v. Phillip Howard White, Jr.*, No. M2001-03109-CCA-R3-CD (Tenn. Crim. App. at Nashville, May 2, 2003), *perm. to appeal denied*, (Tenn. 2003); *State v. Donald Wayne Marshall*, No. E1999-00922-CCA-R3-CD (Tenn. Crim. App. at Knoxville, Feb. 18, 2000). In order to constitute a ground for new trial, an objection must be promptly raised and prejudice must be shown. *Chestnut*, 643 S.W.2d at 346. This issue was not presented to the trial court at any time during the trial. None of the attorneys or the court observed Martin sleeping during the trial. This failure by any of the parties to observe Martin sleeping belies the Appellant's claim that this was an everyday occurrence. Even during the motion for new trial, defense counsel could not assert any facts to show prejudice. The testimony presented at the motion for new trial hearing does not indicate the length of time Martin may have nodded off on this one occasion or the importance of the evidence being presented at this time. This issue has no merit.

As an apparent afterthought in this section of the Appellant's brief, the Appellant asserts, "[J]urors, prior to deliberations, discussed the case amongst themselves and formed and expressed opinions about the [Appellant's] guilt or innocence." First, while testimony concerning this issue was heard from all twelve jurors and both alternate jurors at the motion for new trial hearing, the Appellant's argument does not state this proposition in the form of an issue as required by Rule 27(a)(4), Tennessee Rules of Appellate Procedure. Second, this issue has not been briefed. Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides, in relevant part, that:

> The brief of the appellant shall contain . . . [a]n argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on.

*See also Harvey v. State*, 749 S.W.2d 478, 479 (Tenn. Crim. App. 1987). Third, nowhere in the brief is there reference to the record. Tenn. R. App. P. 27(g). "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). In the present case, the Appellant does not provide this

court with any information concerning jury discussions prior to deliberations or how he was prejudiced by such discussions.[5] In sum, the Appellant has failed to comply with Rule 27. This issue is without merit.

## V. Mathews Time-line

The Appellant next argues that "the Mathews time-line proves [his] innocence; this court cannot ignore this clear proof of innocence." Specifically, he asserts that:

> The Mathews time-line is more than forty pages of detailed entries from the whole universe of Taco Bell information. Most importantly, the Mathews time-line contain entries from statements given by Courtney Mathews to his defense team. . . . Mathews had provided his defense team with a truthful account that completely comports with the credible testimony and physical evidence in this case. . . . Mathews [does not] mention David Housler, or any other accomplice in any aspect whatsoever. . . . There is no more convincing proof that Housler was not involved. If Housler, or any other person had assisted Mathews, this time line would be littered with every detail of their participation. Absence of David Housler from the Mathews time-line indicates the truth. Housler was not involved at Taco Bell. The truth cannot be ignored by this Court.

According to defense counsel Stephanie Gore, she copied the time-line at the office of one of Mathews' attorneys before Housler's trial. At no time prior to the motion for new trial, did the defense bring the information to the attention of the trial court. At most, the defense attempted to subpoena Mathews at trial, but he refused to testify. The time-line was not introduced as an exhibit, and there was never a discussion as to whether the time-line and its contents were admissible.

---

[5]It is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body. *United States v. Resko*, 3 F.3d 684, 688 (3rd Cir. 1993). When jury misconduct is alleged, including improper intra-jury influences, the trial court should: ascertain whether the misconduct actually occurred; if it did, determine whether it was prejudicial; and if there are no grounds for a new trial, specify the reasons it decided that misconduct did not occur or occurred but was non-prejudicial. *Id*. at 691. At the motion for new trial hearing, Alternate Juror Tanksley testified that, during evening card games amongst the male jurors, comments were made that the State "hadn't proven anything" and the case was a waste of the "tax payers money" and the jurors time. He also testified that they commented that the T.B.I. agents "influenced Housler as far as a confession went" and they did not find the witness, who testified to the location of the Appellant's car at the Taco Bell, credible. Furthermore, Tanksley also testified that, during "smoke breaks," the following comments were made: "I'm not getting anything out of this[,]" and "I don't see any guilt verdict[.]" The only other testimony concerning premature deliberations comes from Juror Billy Ray Nipper. Even assuming that these comments support juror misconduct, we nonetheless find no basis for reversal as the Appellant has suffered no prejudice from the premature deliberations. The comments were brief, and the jurors did not rely upon any evidence outside of the record in reaching their verdict. The comments also do not show that any of the jurors actually decided upon the Appellant's guilt before the case was submitted to them. Most importantly, the comments conveyed the belief that the Appellant was innocent and, thus, were favorable to the Appellant. While we find that the issue was waived, the record before us reflects that it was not error to deny relief on this ground.

We note that the Appellant again has failed to comply with Rule 27(a)(7), Tennessee Rules of Appellate Procedure, as the Appellant has not provided this court with any legal authority in support of his claim. Regardless of waiver, this claim is without merit.

The Appellant's argument of "actual innocence" is premised solely on the existence of the time-line and does not relate to sufficiency of the evidence. The State asserts, and we agree, that, "[a]lthough [the Appellant] has not characterized the time-line as newly discovered evidence, the [Appellant] appears to ask this Court to consider it as new evidence proving his innocence in the Taco Bell murders." In seeking a new trial based on newly discovered evidence, a criminal defendant must establish (1) reasonable diligence in attempting to discover the evidence, (2) the materiality of the evidence, and (3) that the evidence would likely change the result of the trial. *State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996) (citing *State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994)). If the defendant fails to show that he and/or his attorney exercised reasonable diligence in the procurement of a witness at the original trial, the trial court may properly deny a motion for new trial based on newly discovered evidence. *Hawkins v. State*, 417 S.W.2d 774, 778 (Tenn. 1967). Moreover, the trial court is afforded broad discretion in deciding whether to grant or deny a motion for new trial based on newly discovered evidence, and its decision will not be overturned on appeal absent a clear abuse of discretion. *State v. Walker*, 910 S.W.2d 381, 395 (Tenn. 1995), *cert. denied*, 519 U.S. 826, 117 S. Ct. 88 (1996).

Clearly, counsel knew of the time-line prior to trial, yet chose not to reveal it prior to or during trial. Additionally, there is no proof that the time-line was material or that the evidence was likely to have changed the result. Ironically, the Appellant contends that Mathews' statements "comport[] with the credible testimony and physical evidence" and asks us to completely disbelieve the statements made by the Appellant to law enforcement. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This court will not reweigh or reevaluate the evidence presented. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). This court does not possess fact finding authority; our jurisdiction being appellate only. Tenn. Code Ann. § 16- 5-108 (1994). Furthermore, many of Mathews' statements contained in the time-line are inconsistent with the proof and other statements attributed to Mathews. For these reasons, the Appellant was not entitled to a new trial based upon the time-line.

## VI. Inconsistent Theories

The Appellant, relying on *Smith v. Groose*, 205 F.3d 1045 (8th Cir.), *cert. denied sub nom. Gammon v. Smith*, 531 U.S. 985, 121 S. Ct. 441 (2000), contends his convictions should be vacated because the State violated his due process rights by presenting evidence and arguments during his trial which were fundamentally inconsistent and inherently contradictory to evidence and arguments

presented during the previous trial of Courtney Mathews.[6]  These cases were tried by two different attorneys general.[7]

Our court, in *State v. Gregory Robinson*, No. W2001-01299-CCA-R3-DD (Tenn. Crim. App. at Jackson, Aug. 13, 2003), *perm. to appeal granted*, W2001-01299-SC-R11-DD (Tenn. Jan. 26, 2004), recently adopted the Eighth Circuit's approach in *Smith*, 205 F.3d 1045.  In *Robinson*, we held a prosecutor's use of factually contradictory theories in separate trials of different defendants violated the principles of due process.  *Gregory Robinson*, No. W2001-01299-CCA-R3-DD (citing *Smith*, 205 F.3d at 1052-53).  *Robinson* also emphasized that:

> such due process claims are unusual, will not often occur, and must exist at the core of the prosecution's case in order to justify relief.  *See Smith*, 205 F.3d at 1052.  A defendant must establish the prosecutorial inconsistencies led to a reasonable likelihood that the outcome of the trial would be different absent the inconsistencies.  *See United States v. Bagley*, 473 U.S. 667, 677, 105 S. Ct. 3375 (1985) (noting failure to provide exculpatory evidence, a due process violation, requires a "reasonable likelihood" of a different outcome in order to secure relief); Anne Bowen Poulin, *Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get Its Story Straight*, 89 Calif. L. Rev. 1423, 1471 (2001) (suggesting adoption of "reasonable likelihood" test).

In accordance with *Robinson*, we must first determine whether the State's prosecution theory in the instant case was contradictory to the evidence or arguments it presented in the previous trial of Courtney Mathews.  The Appellant contends that, at Mathews' trial, the State argued that Mathews acted alone in the Taco Bell robbery and murders, but the State then proceeded to argue at the Appellant's trial that he assisted Mathews in the commission of the crimes by acting as a lookout.  He asserts that:

---

[6]The State argues that:

[the Appellant's arguments regarding inconsistent theories are waived to the extent he relies on the transcript from Courtney Mathews trial.  The Mathews record is not included in the record before this Court.  Tenn. R. App. P. 24. . . . [The Appellant] fails to cite to the record before this Court to support his assertions.  Rule 10(b), Rules of the Court of Criminal Appeals.

This court has previously denied the Appellant's request to supplement the record with the transcript from Courtney Mathews' trial.  *See State v. David G. Housler*, No. M2003-03122-CCA-R10-CD (Tenn. Crim. App. at Nashville, Feb. 23, 2004).  We agree with the State that this argument is waived to the extent he relies on the Mathews' transcript; however, we find the current record is sufficient to address this issue.

[7]John Carney is the Attorney General for the 19th Judicial District, which includes Montgomery County.  Attorney General Carney was involved in the prosecution of Courtney Mathews.  He and  Assistant Attorney General Steven L. Garrett recused themselves from the prosecution of the Appellant because they were potential witnesses in his case.  Attorney General Robert "Gus" Radford of the 24th Judicial District was appointed Attorney General *Pro Tem* in the prosecution of the Appellant.

In the Mathews' case, the prosecutors conformed their presentation to competent physical proof and to credible witness testimony. The Mathews prosecution matches the Mathews Time Line, which is the truth. However, in the Housler prosecution, the prosecuting attorneys used Housler's false confession as their centerpiece, and then tried to corroborate one aspect of it to meet their burden. The Mathews trial was an effort to prove the truth; the Housler trial was an effort to prove a false confession. The result is necessarily inconsistent.

The Appellant's argument on inconsistent theories rehashes many of the previous issues. Because we have found the Appellant's previous issues, concerning the Mathews time-line, recanted testimony, and use of the Appellant's confession, to be without merit, we will not address them again.

The Appellant goes on to point out numerous factual inconsistencies in support of his position, including discrepancies in time, cars seen by witnesses at the Taco Bell, whether Mathews hid in the bathroom ceiling or whether the broken ceiling tile was staged, the purchase of ammunition for the robbery, and the location of the shotgun before it was used to commit these crimes.[8] For example, the Appellant claims that the State's theory in Mathews that he drove his own car to the Taco Bell was inconsistent with the statement presented at this trial that the Appellant drove Mathews to the Taco Bell. Assistant Attorney General Steven Garrett testified at the Appellant's trial that he believed Mathews could have driven himself to Taco Bell, although several cars were involved in the crimes. The Appellant again invites us to conclude that Mathews' statements are more credible than his. Credibility of witness and all factual issues are determinations for the trier of fact. *Pappas*, 754 S.W.2d at 623. Furthermore, relying on the closing argument in the Mathews' trial, the Appellant maintains that the State asserted the Appellant acted alone. Attorney General John Carney testified that his closing argument was directed towards Courtney Mathews because he was the person on trial. Carney also testified that he believed more than one person was involved because one person acting alone could not have done everything.

The mere fact that some of the evidence presented in the Mathews' trial was not consistent with some of the evidence in the Appellant's trial does not mean that the State presented factually irreconcilable theories. The government is not required to "present precisely the same evidence and theories in trials for different defendants." *Smith*, 205 F.3d at 1052. Furthermore, the government's inconsistency "must exist at the core of the prosecutor's case against the defendants for the same crime" in order to justify relief. *Id.* The factual inconsistencies between the Appellant's trial and Mathews' trial did not exist at the core of the prosecution's case. The State prosecuted Mathews as the shooter and the Appellant as the lookout. In fact, the State introduced much of the evidence from the Mathews' trial at the trial of the Appellant. We conclude that the State did not advocate

_____

[8]At oral argument in this case, it was developed that the trial court ruled that the State's theories were "mutually exclusive of one another[;]" however, the trial court, summarily denied the Appellant's motion for new trial. Thus, we must conclude that the trial court either reversed its oral finding on the subject or concluded that there was not a "reasonable likelihood" that the outcome of the trial would have been different absent the inconsistencies. Without these findings, we proceed to address, in full, the merits of this issue.

inconsistent theories in the prosecution of the Appellant and Mathews. Furthermore, the factual inconsistencies relied upon by the Appellant were not central to the State's case. Because there is no showing of a "reasonable likelihood" of a different result, we conclude there was no violation of the Appellant's due process rights. *See Robinson*, No. W2001-01299-CCA-R3-DD.

## VII. Sentencing

Finally, the Appellant contends that the trial court erred by ordering his four life sentences to be served consecutively. Appellate review of the imposition of consecutive sentences is *de novo* with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). The presumption of correctness imposes upon the appealing party the burden of showing that the sentence imposed is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Consecutive sentences are warranted if the trial court finds, by a preponderance of the evidence, that any of the seven enumerated criteria of Tennessee Code Annotated § 40-35-115(b) (2003) exists. Moreover, in determining whether the sentencing court providently exercised its discretion, "the overriding concern" is the fairness of the resulting sentence under all the circumstances. *State v. Sullivan*, No. M1999-02547-CCA-R3-CD (Tenn. Crim. App. at Nashville, Oct. 13, 2000); *see generally Gray v. State,* 538 S.W.2d 391 (Tenn. 1976).

In this case, the trial court found that the Appellant was "a dangerous offender whose behavior indicate[d] little or no regard for human life and no hesitation about committing a crime when risk to human life [was] high." Tenn. Code Ann. § 40-35-115(b)(4). Additionally, for purposes of a dangerous offender classification, the trial court, in accordance with *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995), found that an extended sentence was necessary to protect the public against further conduct by the Appellant and consecutive sentencing reasonably related to the severity of the offenses.

The Appellant argues that, because no aggravating circumstances existed, he can not be sentenced as a dangerous offender. He bases this assertion on the fact that the jury imposed a sentence of life with the possibility of parole and, thus, did not find any "statutory aggravating circumstance" to exist. The Appellant is correct that the decision to impose consecutive sentences when crimes inherently dangerous are involved should be based upon the presence of aggravating circumstances and not merely on the fact that two or more dangerous crimes were committed, *Gray*, 538 S.W.2d at 393; however, his argument is misguided. In order to impose a sentence of life without parole, which this jury did not do in this case, one of the enumerated aggravating circumstances must be found to exist beyond a reasonable doubt. *See* Tenn. Code Ann. § 39-13-204(h) (2003). When imposing consecutive sentences as a dangerous offender pursuant to Tennessee Code Annotated § 40-35-115(b)(4), the trial court is not limited to the enumerated aggravating circumstances of Tennessee Code Annotated § 39-13-204(h). *See State v. John V. Woodruff*, No. 01C01-9507-CR-00217 (Tenn. Crim. App. at Nashville, Aug. 1, 1996) (two consecutive life sentences for murder); *State v. Kong Chung Bounnam*, No. 02C01-9803-CR-00095 (Tenn. Crim. App. at Jackson, Aug. 16, 1999), *perm. to appeal denied*, (Tenn. 2004) (two of three life sentences

for murder were ordered to be served consecutively). Thus, we proceed to determine if sufficient aggravating circumstances existed in this case to classify the Appellant as a dangerous offender.

In its sentencing decision, the trial court ordered the Appellant to serve consecutive sentences and reasoned in part as follows:

> There was testimony by Mr. Housler and others, that Mr. Housler met Mr. Courtney Mathews at a trailer up in Oak Grove, Kentucky, this side of Oak Grove and that there, there was an announcement, if not a plan, announced by Mr. Mathews that he was going to the rob his place of employment and that that place of employment was the Taco Bell. There was testimony that Mr. Housler, in his words, gassed up Mr. Mathews, encouraged him to do that. There was testimony that Mr. Housler said that he knew that when the robbery took place, that it was Mr. Mathews' intent to leave no witnesses.

> There was a showing, based on the evidence, that there was a planning of this robbery. There was sufficient evidence to sustain the finding by the jury that it was the intent of Mr. Mathews to kill everybody in there. And it was a – the evidence was sufficient for this jury to conclude that Mr. Housler knew that Mr. Mathews was going to do that and he knew that the lives of those people were in jeopardy. Not only did he know that, but there was evidence that Mr. Housler indicated a willingness. In fact, he said at one point, that he could be talked into it. There were statements by Mr. Housler that efforts were made to carry out the robbery, that efforts were made to put together the wherewithhall to carry out the robbery. Mr. Housler, by his own words, said that he went down there, that he acted as a look out, and so it is . . . reasonable that the jury could conclude that Mr. Housler engaged in the planning of it. That he engaged in the preparations for it. That he engaged in participation of it, and that he knew that when Mr. Mathews went in there, that he was armed and that he knew when he came out of there, that the likelihood was that nobody was going to be alive.

> . . .

> So is Mr. Housler a dangerous offender whose behavior indicates little or no regard for human life? Yes, because he knew what was going to take place. He knew that the plan was to kill everybody, and he participated willingly to aid in that happening.

> The next factor is did he have any hesitation about committing that crime? Or committing a crime in which the risk was high? By his own words, he said he could be talked into it. By his own words, he went down there. There is no evidence that he abandoned the notion. There is no evidence that he made any effort to change Mr. Mathews' mind. There is no evidence that he did anything that would be

probative of hesitation. And the fact that he went down there in the fashion stated by the Court, indicates that there was no hesitation on his part in committing this crime, along with Mr. Mathews when he knew that human life was at risk.

. . .

The <u>Wilkerson</u> case requires that a consecutive sentence must be or can be ordered only if there is some specific relationship between the severity of the offenses and consecutive service. . . .

These offenses are severe[.] . . . [T]he severity of the offenses are certainly great. They are [egregious]. And considering the principles, considering the severity of the crime, the Court finds that an extended sentence is necessary to protect the public against further criminal conduct by the [Appellant] and that a consecutive sentence is reasonably related to the severity of the offenses that were committed.

We agree with the trial court that consecutive sentencing in this case is clearly congruent with general principles of sentencing. The record establishes that the Appellant aided in the planning of the robbery, participated in the robbery by acting as a lookout, and knew Mathews intended to "leave no witnesses." The Taco Bell employees were murdered execution-style. Furthermore, the Appellant, by his own admission, "gassed up" Mathews to commit the robbery and murders. Clearly, the Appellant is a dangerous offender whose behavior reflects no regard for human life and no hesitation about committing violent offenses where risk to life is high. Moreover, the aggregate sentence imposed is reasonably related to the severity of the offenses and is necessary to protect the public from further criminal acts by the Appellant. The Appellant is not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing, we affirm the Appellant's four convictions for felony murder and the imposition of four consecutive life sentences.

_____
DAVID G. HAYES, JUDGE